[Cite as *State v. Thompson*, 2018-Ohio-637.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO. 13-17-26

      v.

JINETTA L. THOMPSON,             O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 15-CR-0152

**Judgment Affirmed**

Date of Decision:    February 20, 2018

APPEARANCES:

    *Jennifer L. Kahler* **for Appellant**

    *Stephanie J. Kiser* **for Appellee**

**PRESTON, J.**

**{¶1}** Defendant-appellant, Jinetta L. Thompson ("Thompson"), appeals the August 18, 2017 judgment entry of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

**{¶2}** On August 19, 2015, the Seneca County Grand Jury indicted Thompson on six counts, including: Count One of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4)(b), a fourth-degree felony; Count Two of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4)(a), a fifth-degree felony; Count Three of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4)(a), a fifth-degree felony; Count Four of trafficking in cocaine in violation of R.C. 2925.03(A)(2), (C)(4)(d), a second-degree felony; Count Five of possessing criminal tools in violation of R.C. 2923.24(A), (C), a fifth-degree felony; and Count Six of endangering children in violation of R.C. 2919.22(A), (E)(2)(a), a first-degree misdemeanor. (Doc. No. 5). Counts One and Four of the indictment include a specification alleging that Thompson committed the offenses in the presence of a juvenile. (*Id.*). Counts One through Four of the indictment include a forfeiture specification under R.C. 2981.02. (*Id.*). The forfeiture specification identifies $1415.00, a surveillance-security system, a Samsung cellphone, a Kyocera cellphone, and a Verizon cellphone as property "subject to forfeiture as proceeds

derived from or instrumentalities used in the commission or facilitation of" the offenses in Counts One through Four of the indictment. (*Id.*).

**{¶3}** The State filed a bill of particulars on September 3, 2015. (Doc. No. 9).

**{¶4}** On September 4, 2015, Thompson appeared for arraignment and entered pleas of not guilty. (Doc. No. 11).

**{¶5}** On March 21, 2016, Thompson filed a motion for leave to file a motion to suppress evidence. (Doc. No. 27). The State filed its response to Thompson's motion for leave to file a motion to suppress evidence on March 23, 2016. (Doc. No. 28). The trial court granted Thompson's motion for leave to file a motion to suppress evidence on March 25, 2016. (Doc. No. 32).

**{¶6}** Thompson filed a motion to suppress evidence on April 6, 2016. (Doc. No. 33). On July 18, 2016, the State filed a memorandum in opposition to Thompson's motion to suppress evidence. (Doc. No. 47). That same day, the State filed a motion "to quash the subpoena [Thompson] issued to Gerald Heffelfinger" ("Heffelfinger"), arguing that "Heffelfinger is not listed in State's discovery as a witness in this case, and the State properly certified the confidential informant's identity in discovery as non-disclosed informant," which the trial court granted on July 21, 2016. (Doc. Nos. 46, 49).

**{¶7}** On July 25, 2016, the trial court denied Thompson's motion to suppress evidence. (Doc. No. 51). Thompson filed a motion to reconsider her motion to

suppress evidence on September 14, 2016, which the trial court denied that same day. (Doc. Nos. 73, 76).

{¶8} The State filed a second bill of particulars on March 29, 2017. (Doc. No. 107).

{¶9} On March 31, 2017, Thompson filed "Defense Notice of Witness and Motion in Limine Re: Defense Witness Immunity." (Doc. No. 108). Also that day, Thompson filed a motion "to disaggregate Count IV of the Indictment." (Doc. No. 109).

{¶10} On April 3, 2017, Thompson filed a second motion for leave to file a delayed motion to suppress evidence. (Doc. No. 110).

{¶11} On May 9, 2017, the State filed its memoranda in opposition to Thompson's motion in limine and motion to disaggregate Count IV of the indictment. (Doc. Nos. 114, 115).

{¶12} On June 1, 2017, the trial court granted Thompson's motion for leave to file a delayed motion to suppress evidence and motion in limine, and denied Thompson's motion to disaggregate Count IV of the indictment. (Doc. No. 117).

{¶13} On June 8, 2017, Thompson filed a motion to reconsider her motion to disaggregate Count IV of the indictment, which the trial court denied on July 14, 2017. (Doc. Nos. 122, 141).

{¶14} That same day, Thompson filed a delayed motion to suppress evidence. (Doc. No. 121). On June 15, 2017, the State filed a memorandum in opposition to Thompson's delayed motion to suppress evidence. (Doc. No. 127). That same day, Thompson filed her response to the State's memorandum in opposition to Thompson's delayed motion to suppress evidence. (Doc. No. 126). The trial court denied her delayed motion to suppress evidence on July 14, 2017. (Doc. No. 141).

{¶15} On June 30, 2017, the trial court denied Thompson's motion for witness immunity. (Doc. No. 138).

{¶16} The case proceeded to jury trial on July 17-20, 2017. (Doc. No. 147). On July 20, 2017, the jury found Thompson guilty of the counts of the indictment. (Doc. Nos. 147, 148). The jury found Thompson guilty of the specifications in Counts One and Four alleging that Thompson committed the offenses in the presence of a juvenile. (*Id.*). The jury found that the surveillance-security system is subject to forfeiture. (*Id.*). The trial court filed its judgment entry of conviction on July 20, 2017. (Doc. No. 147).

{¶17} On August 18, 2017, the trial court sentenced Thompson to nine months in prison on Count One, seven months in prison on Count Two, seven months in prison on Count Three, five years in prison on Count Four, seven months in prison on Count Five, and 90 days in jail on Count Six, and ordered that

Thompson serve the terms concurrently for an aggregate sentence of five years in prison. (Doc. No. 152).

{¶18} On September 13, 2017, Thompson filed her notice of appeal. (Doc. No. 155). She raises four assignments of error for our review, which we address together.

### Assignment of Error No. I

**The Trial Court Erred in Finding Appellant Guilty Trafficking [sic] in Cocaine with a Weight Exceeding 10 Grams When the Conviction Was Against the Manifest Weight of the Evidence.**

### Assignment of Error No. II

**The Trial Court Erred in Finding Appellant Guilty of Child Endangering Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

### Assignment of Error No. III

**The Trial Court Erred in Finding Appellant Guilty of Possessing Criminal Tools When the Conviction Was Against the Manifest Weight of the Evidence.**

### Assignment of Error No. IV

**The Trial Court Erred in Finding Appellant Guilty of Trafficking in Cocaine When the Conviction Was Against the Manifest Weight of the Evidence.**

{¶19} In her second assignment of error, Thompson argues that her child-endangering conviction is based on insufficient evidence. In her first and fourth assignments of error, Thompson argues that her trafficking-in-cocaine convictions

are against the manifest weight of the evidence. In her third assignment of error, Thompson argues that her possessing-criminal-tools conviction is against the manifest weight of the evidence.

**{¶20}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

**{¶21}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19

("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶22}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶23}** At trial, the State offered the testimony of Officer Nate Elliott ("Officer Elliott") of the Fostoria Police Department, who testified that he was the lead-case manager with the Seneca County Drug Task Force ("Task Force") of the controlled-narcotics operations on July 14 and 15, 2015 involving Thompson. (July

17, 2017 Tr., Vol. I, at 166, 174, 189-190). Officer Elliott testified that confidential informant ("CI"), Gerald Heffelfinger ("Heffelfinger"), purchased cocaine from Thompson during the controlled-narcotics operations on July 14 and 15, 2015. (*Id.* at 176, 192).

{¶24} On July 14, 2015, Heffelfinger purchased $60 worth of cocaine from Thompson during the controlled-narcotics operation. (*Id.* at 174, 176, 177, 184). As part of the operation, an audio and video-recording device was affixed to Heffelfinger, Heffelfinger and Heffelfinger's vehicle were searched for contraband, and Heffelfinger was provided $60 "of covert funds." (*Id.* at 176-178). Officer Elliott testified that he "was present for the entire operation, pre- and post-operation" and that Heffelfinger was "under surveillance during the entire operation." (*Id.* at 176, 178).

{¶25} Officer Elliott and Officer Gabriel Wedge ("Officer Wedge") of the Fostoria Police Department, who was a detective with the Task Force in July 2015, surveilled the controlled-narcotics operation from a vehicle that was parked "to the east of [Thompson's residence]." (*Id.* 179-180, 239). Officer Elliott testified that Heffelfinger travelled to Thompson's residence without making any detours or coming into contact with anyone else. (*Id.* at 177-178, 181). He testified that he observed Heffelfinger "exit his vehicle" and walk "up to the porch" of Thompson's residence where Heffelfinger remained "for, approximately, three minutes, two to

three minutes" before he returned to his vehicle. (*Id.* at 180). According to Officer Elliott, at the completion of the "buy," Heffelfinger left Thompson's residence by driving west at which time Detective Charles W. Boyer ("Detective Boyer"), the unit commander of the Task Force, "followed him back to the predetermined location." (*Id.*). "Once we arrived at the predetermined location, we removed the audio and visual surveillance [and Heffelfinger] handed [Officer Elliott] a * * * bag with a white rock like substance." (*Id.* at 182). Law enforcement again searched Heffelfinger and Heffelfinger's vehicle but "found no additional contraband." (*Id.*).

{¶26} Officer Elliott testified that law enforcement interviewed Heffelfinger about the controlled-narcotics operation:

> He had stated that once he arrived at [Thompson's residence], he went
> up to the front porch, made contact with her. Stated that she was
> talking on her cell phone. Stated that she had took the crack, put it on
> a window sill that * * * is to the left side. * * * And then he had issued
> her the covert funds. After that he stated that he walked back down
> towards his car and met us back at the predetermined location.

(*Id.*). Officer Elliott identified State's Exhibit 3 as the video recording of the July 14, 2015 controlled-narcotics operation. (*Id.* at 186). He testified that the video recording substantiates Heffelfinger's version of events. *(Id.* at 187). Further, Officer Elliott testified that "watching the video you could hear multiple children

present in the background that appeared to be in the same room as Ms. Thompson."
(*Id.* at 187).

{¶27} Officer Elliott identified State's Exhibits 4 and 5 as photographs taken from the video recording of the July 14, 2015 controlled-narcotics operation. (*Id.* at 188). State's Exhibit 4 depicts Thompson holding the covert funds that Heffelfinger provided to her. (*Id.*). State's Exhibit 5 depicts "the white, rock like substance" on the window sill. (*Id.*). Officer Elliott identified State's Exhibit 1 as the cocaine that Heffelfinger purchased from Thompson during the controlled-narcotics operation on July 14, 2015. (*Id.* at 183-184).

{¶28} On July 15, 2015, Heffelfinger purchased $100 worth of cocaine from Thompson during the controlled-narcotics operation. (*Id.* at 192). Prior to the operation, law enforcement searched Heffelfinger and Heffelfinger's vehicle, and outfitted Heffelfinger with an audio-and-video-recording device. (*Id.* at 190-192). After Officer Elliott observed Thompson at her residence on July 15, 2015, Heffelfinger went to Thompson's residence to purchase cocaine in a manner similar to the July 14, 2015 controlled-narcotics operation. (*Id.* at 191-192). Officer Elliott described:

> [Heffelfinger] parked in front of [Thompson's] residence. Went up.
> Once he got to a certain point, I couldn't see him any longer. Got
> back in his vehicle after a couple minutes. And then he left that

> location. We followed him back. Once we arrived back at the predetermined location, he turned over a bag of white rock like substance. He was searched again. The vehicle was searched. No contraband was found on either, and then we conducted the post-operational protocol.

(*Id.* at 192). (*See also id.* at 193-194). However, Officer Elliott testified that the audio and visual equipment affixed to Heffelfinger did not operate properly and failed to capture the controlled-narcotics operation. (*Id.* at 198-199). Officer Elliott identified State's Exhibit 6 as the cocaine that Heffelfinger purchased from Thompson on July 15, 2015. (*Id.* at 195).

{¶29} Officer Elliott participated in the execution of a search warrant at Thompson's residence on July 20, 2015. (*Id.* at 199). As part of his search of Thompson's residence, Officer Elliott discovered "surveillance cameras that were positioned outside of the residence as well as a recording device inside the residence." (*Id.* at 200). (*See also* State's Exs. 9, 10, 11). According to Officer Elliott, surveillance systems are commonly found in homes of narcotics traffickers "to monitor their residence against theft" and "police." (July 17, 2017 Tr., Vol. I, at 201). Officer Elliott also testified that he "was present in the kitchen when a large amount of what appeared to be cocaine was located" in an amount "more than what [he] typically would say is personal use cocaine." (*Id.* at 202).

**{¶30}** On cross-examination, Officer Elliott testified that Heffelfinger became a CI because "he was caught with drugs in his car." (*Id.* at 203). He testified that Heffelfinger entered an agreement with the Fostoria Police Department, the Task Force, and the Seneca County Prosecutor's Office "to provide some controlled buys" in exchange for "some favor with respect to the disposition of [his] own case." (*Id.* at 205-206).

**{¶31}** According to Officer Elliott, because CIs "probably [] have a problem with cocaine or other substances," they are, "[t]o a certain extent" "not entirely trustworthy." (*Id.* at 206). Because they are not entirely trustworthy, law enforcement conducts "pre-controlled buy and post-controlled buy protocol" by searching the CI and his or her vehicle. (*Id.* at 207). Officer Elliott described the search protocol. (*See id.* at 207-210). (*See also id.* at 212-213).

**{¶32}** Officer Elliott testified that Heffelfinger purchased a "very thin, small" package of cocaine from Thompson on July 14, 2015. (*Id.* at 209). As such, Officer Elliott conceded that law enforcement could have missed the package of cocaine during their search of Heffelfinger and Heffelfinger's vehicle, and Heffelfinger could have taken the drugs to Thompson's residence. (*Id.* at 212).

**{¶33}** Officer Elliott testified that he did not search Heffelfinger's phone to corroborate Heffelfinger's assertion that he contacted Thompson about purchasing

narcotics after Heffelfinger asserted to Officer Elliott that he could purchase narcotics from Thompson. (*Id.* at 223).

**{¶34}** Officer Elliott testified that the cocaine discovered during the search of Thompson's residence was discovered in kitchen cabinets that are "seven - - eight feet to the top." (*Id.* at 227-228).

**{¶35}** On re-direct examination, Officer Elliott testified that law enforcement corroborate CI statements by "tak[ing] the totality of everything, [law enforcement's] visual surveillance, and the protocols that are put in place to ensure the integrity of the entire case." (*Id.* at 229). Indeed, he testified that CIs are "not very credible at times, and they often lie. So we put procedures in place to ensure * * * the integrity of the case." (*Id.* at 230).

**{¶36}** Officer Elliott confirmed that there was not "any evidence that the drugs were hidden on [Heffelfinger]." (*Id.*). He testified that the evidence that the cocaine was on Thompson's windowsill contradicts that Heffelfinger was hiding the cocaine on his body or in his vehicle. (*Id.*).

**{¶37}** Officer Elliott testified that Thompson could "possibly" reach the top of the cabinet in which the cocaine was discovered at her residence. (*Id.* at 232).

**{¶38}** On re-cross examination, Officer Elliott clarified that Thompson would have to "[g]et up on the counter, use a step stool" to be able to access the cocaine that was discovered in the kitchen. (*Id.* at 232-233).

**{¶39}** Next, Officer Wedge testified that he assisted with the July 14 and 15, 2015 controlled-narcotics operations by surveilling Heffelfinger. (July 18, 2017, Vol. II, at 239, 240-242, 244-245). Officer Wedge further testified that he was the lead-case manager of a controlled-narcotics operation on July 16, 2015 involving Thompson. (*Id.* at 245-246). During that controlled-narcotics operation, Heffelfinger purchased $60 worth of cocaine from Thompson. (*Id.* at 247). The July 16, 2015 controlled-narcotics operation followed the same protocol that was utlized for the previous operations. (*Id.* at 246-248). Officer Wedge described:

> [W]e left the predetermined location, followed [Heffelfinger] to [Thompson's] residence on Bannister Street. [He and Detective Donald Joseph ("Detective Joseph") of the Seneca County Sheriff's Office were] east of the location. Watched [Heffelfinger] pull up in front of the residence, go up to the residence. And once he left, we then picked him up again and followed him back to the predetermined location.

(*Id.* at 248-249). Officer Wedge testified that he observed Heffelfinger the entire time Heffelfinger was travelling to and from Thompson's residence and did not see him make any stops or come into contact with anyone. (*Id.* at 249).

**{¶40}** Officer Wedge identified State's Exhibit 28 as the cocaine that Heffelfinger purchased from Thompson on July 16, 2015. (*Id.* at 250-251). He

identified State's Exhibit 30 as the video recording of the July 16, 2015 controlled-narcotics operation. (*Id.* at 253).

{¶41} Officer Wedge testified that he participated in the execution of the July 20, 2015 search warrant at Thompson's residence. (*Id.* at 254). Officer Wedge testified that he discovered "what looked like crumbs or flakes of what appeared to be crack cocaine" on a dresser in the bedroom, "a digital scale in the drawer in the kitchen," and "what appeared to be crack cocaine in a plastic bag" "up above one of the cabinets in the kitchen." (*Id.* at 255). He identified State's Exhibits 23, 24, 25, 26, and 27 as photographs documenting the items he discovered during the search. (*Id.*). He identified State's Exhibit 31 as two pieces of evidence—the "flakes of [the] white powder substance" that he observed in the bedroom and "four baggies of rock-like substance" discovered in the kitchen. (*Id.* at 257).

{¶42} On cross-examination, Officer Wedge testified that he did not confirm that there were any conversations between Heffelfinger and Thompson regarding the sale of cocaine. (*Id.* at 261-262). However, Officer Wedge testified that law enforcement utilizes specific protocols to ensure the integrity of controlled-narcotics operations because CIs are not always trustworthy. (*Id.* at 266-268). He testified that law enforcement follow those protocols to ensure that a CI "doesn't try to set someone else up." (*Id.* at 268).

{¶43} Officer Wedge described how cocaine is packaged for sale and how cocaine is turned into crack cocaine. (*See id.* at 277-285). According to Officer Wedge, the cocaine that he discovered during the execution of the search warrant is not the same weight as the "packaged" cocaine that Heffelfinger purchased from Thompson. (*Id.* at 285-286). He described each of the four bags discovered in the kitchen. (*See id.* at 290-295). He testified that three of the four bags are bigger than the packages purchased by Heffelfinger; that two of the bags are "more of a powder base than it is a rock-like substance"; that the third bag "is more consistent with the crack cocaine"; and the fourth bag contains "a trace" or "residue" of cocaine. (*Id.*). He testified that the cocaine purchased by Heffelfinger "are all rock form." (*Id.* at 293).

{¶44} On re-direct examination, Officer Wedge described the cocaine purchased by Heffelfinger. (*Id.* at 299-301). Each of Heffelfinger's cocaine purchases are wrapped individually and the July 14 and 16, 2015 purchases are approximately the same amount of cocaine—$60 worth—and the July 15, 2015 purchase is approximately double the amount of the July 14 and 16 purchases—$100 worth. (*Id.* at 300-301).

{¶45} On re-cross examination, Officer Wedge testified that the weight of the cocaine purchased by Heffelfinger on July 14, 2015 was .35 grams—"[p]lus or minus .04—and the weight of the cocaine purchased by Heffelfinger on July 16,

2015 was .44 grams. (*Id.* at 305). (*See also* State's Exs. 2, 28). Officer Wedge testified that the difference in weight indicates that either a scale was not used or, if a scale was used, it was unreliable. (July 18, 2017 Tr., Vol. II, at 306). Officer Wedge testified that Thompson did not go back inside her residence before selling the cocaine to Heffelfinger; rather, "there was a brief meeting at the front porch." (*Id.* at 306-307). He testified that individually packaged cocaine approximating .3 to .7 grams was not discovered during the search of Thompson's residence. (*Id.* at 309).

**{¶46}** As its next witness, Heffelfinger testified on behalf of the State that he worked for the Task Force as a CI in July 2015. (*Id.* at 312-313). In exchange for working for the Task Force, Heffelfinger was not charged with any crime after law enforcement "caught [him] with a little bit of cocaine." (*Id.* at 313). He testified that he was convicted of felony offenses—possession of cocaine and breaking and entering—in 2007 and 2013, respectively. (*Id.* at 313-314). (*See also id.* at 331-333). Heffelfinger testified that he knows Thompson "[t]hrough drugs." (*Id.* at 314).

**{¶47}** Heffelfinger testified that he participated in a controlled-narcotics operation on July 14, 2015. (*Id.* at 314-315). As part of the operation, Heffelfinger "met [law enforcement] at a predetermined location, and they searched [him], searched [his] car, gave [him] some drug money and wired [him] up and [he] went

and made the buy." (*Id.* at 315). He testified that law enforcement did not find any contraband after searching Heffelfinger and Heffelfinger's vehicle. (*Id.*). Heffelfinger identified State's Exhibit 3 as the video recording of the July 14, 2015 controlled-narcotics operation, which was subsequently played for the jury. (*Id.* at 316-317). Heffelfinger testified that, during the transaction, Thompson "put the drugs down on the window sill [and he] laid the money down, picked [the drugs] up, and left." (*Id.* at 318). He identified State's Exhibit 5 as a photograph—Thompson's window sill with the cocaine on it—depicting the sale as he described it. (*Id.*). He testified that he did not "stop and meet with anyone on [his] way to [Thompson's] house" and "got in [his] car and drove back to the predetermined location" after purchasing the cocaine from Thompson. (*Id.* at 317-319). Heffelfinger identified State's Exhibit 1 as the cocaine that he purchased from Thompson on July 14, 2015. (*Id.* at 319).

{¶48} Heffelfinger described the July 15, 2015 controlled-narcotics operation in which he participated. (*Id.* at 319-320). He testified that law enforcement utilized the same protocol as the July 14, 2015 controlled-narcotics operation. (*Id.* at 320). He testified that he initially had trouble contacting Thompson. (*Id.* at 320-321). Even though Thompson did not respond to Heffelfinger's phone calls, Heffelfinger went to Thompson's house and she answered the door. (*Id.* at 320-322). He testified that the transaction again occurred

on the front porch—Heffelfinger "put up how much [cocaine he] wanted, [Thompson] left for a couple minutes and brought [the cocaine] back," and Heffelfinger gave Thompson the money. (*Id.* at 322). According to Heffelfinger, Thompson handed him the cocaine. (*Id.*). After the transaction, Heffelfinger returned to the predetermined location. (*Id.* at 322). He testified that he did not have contact with anyone else between the time Thompson handed him the drugs and the time he reunited with Officer Elliott. (*Id.* at 322-323). Heffelfinger identified State's Exhibit 6 as the cocaine that he purchased from Thompson on July 15, 2015. (*Id.* at 323).

**{¶49}** Heffelfinger also testified that he was part of the controlled-narcotics operation on July 16, 2015. (*Id.* at 323). Heffelfinger testified that law enforcement utilized the same preoperational protocol as the previous operations. (*Id.* at 324). Heffelfinger identified State's Exhibit 30 as a video recording of the July 16, 2015 controlled-narcotics operation, which was subsequently played for the jury. (*Id.* at 325-326). After meeting with law enforcement at the predetermined location, Heffelfinger travelled directly to Thompson's residence without coming into contact with anyone else. (*Id.* at 326). Once he arrived at Thompson's residence, he "walked up," "[s]he laid the drugs down," and Heffelfinger "put the money down and grabbed [the drugs] and walked away." (*Id.*). After the transaction was complete, Heffelfinger returned to the predetermined location without coming into

contact with anyone else. (*Id.* at 327). He identified State's Exhibit 28 as the cocaine that he purchased from Thompson on July 16, 2015. (*Id.*).

{¶50} On cross-examination, Heffelfinger testified that he agreed to work for law enforcement as a CI after law enforcement discovered "a little bit of crack cocaine in [his] car." (*Id.* at 334). After being caught with the crack cocaine, Heffelfinger informed law enforcement that he purchased the cocaine from Thompson. (*Id.* at 336). According to Heffelfinger, as part of his duties as a CI, he was to purchase drugs from three people, including Thompson. (*Id.* at 336-337). Heffelfinger was unable to purchase drugs from one of those three people— Torrance Thompson ("Torrance"), Thompson's husband,—"because he had recently gone to prison." (*Id.* at 337). Heffelfinger testified that Thompson shared the residence with Torrance and Torrance went to prison "because he would go to the bedroom, get the drugs, bring [them] out front, sell [the drugs] off the front" and "that's why he caught the case instead of [Thompson]." (*Id.* at 338). Heffelfinger testified that he bought narcotics from Torrance and Thompson. (*Id.*).

{¶51} Heffelfinger testified that law enforcement did not substantiate any of the calls he exchanged with Thompson setting up the controlled-narcotics operations. (*Id.* at 339-340). Heffelfinger described law enforcement's pre-and-post-operation-protocol searches of his person and his vehicle. (*Id.* at 342-352).

**{¶52}** Next, Larry A. Rentz ("Rentz") of the Ohio Bureau of Criminal Investigation ("BCI") testified that he analyzed the "cocaine as to identity and weight for this case." (*Id.* at 363). Rentz identified State's Exhibit 2 as a copy of his report regarding his analysis of State's Exhibit 1—the cocaine purchased by Heffelfinger from Thompson on July 14, 2015. (*Id.* at 367). According to Rentz, the "white material weighed 0.35 grams and was found to contain cocaine." (*Id.* at 367-368). He identified State's Exhibit 7 as his report regarding his analysis of State's Exhibit 6—the cocaine purchased by Heffelfinger from Thompson on July 15, 2015. (*Id.* at 368-369). He testified that "the white material that's herein contained weighed 0.7 grams and is found to contain cocaine." (*Id.* at 370). Lastly, Rentz identified State's Exhibit 29 as his report regarding his analysis of State's Exhibit 28—the cocaine purchased by Heffelfinger from Thompson on July 16, 2015. (*Id.* at 370-371). He testified that "the white material contained herein is 0.44 grams and it's found to contain cocaine." (*Id.* at 372).

**{¶53}** On cross-examination, Rentz testified that BCI tests drugs for weight first because a portion of the substance may be used for other testing resulting in a reduced weight of the substance. (*Id.* at 382).

**{¶54}** As its next witness, the State offered the testimony of Sara Tipton ("Tipton") of BCI. (*Id.* at 400). Tipton identified State's Exhibit 34 as her report prepared on July 30, 2015 regarding her analysis of State's Exhibit 31—the bags of

cocaine seized as part of the search of Thompson's residence. (*Id.* at 403-405). She testified, "For Item 1 less than 0.10 gram [sic]; Item 2.1 was 5.81 plus or minus .04 grams; Item 2.2 was 5.33 grams plus or minus .04 grams" and that "[a]ll three of them were found to contain cocaine." (*Id.* at 405). She testified that the total weight of Items 2.1 and 2.2 is 11.06 grams of cocaine. (*Id.* at 405-406). She testified that Item "2.1 appeared to be a powder and 2.2 was a solid chunk." (*Id.* at 407).

{¶55} Tipton identified State's Exhibit 36 as a lab report prepared on January 26, 2017 by an expert hired by Thompson. (*Id.* at 406, 408). She testified that State's Exhibit 36 reflects different weights for Items 2.1 and 2.2—that is, State's Exhibit 36 reflects a weight of 5.70 grams plus or minus .02 grams for Item 2.1 and 3.84 grams plus or minus .01 grams for Item 2.2. (*Id.* at 406-407). Regarding the weight discrepancy, Tipton testified that she could not "speak as to how they checked the calibration on their balances"; that the substances that "appear[ed] to be crack cocaine, which is made with a wet process," "would evaporate the moisture over time"; "[a]nd they would have tested it after [she] tested it, so the amounts would have been after [she] had sampled and tested." (*Id.* at 408).

{¶56} On cross-examination, Tipton testified that the weight of Item 2.1 reflected in State's Exhibit 36 is within the margin of error. (*Id.* at 41). She testified that it is possible that Item 2.2 could have weighed 3.84 grams—as reflected by State's Exhibit 36—if all moisture was removed from the crack cocaine. (*Id.* at

412). Tipton testified that BCI protocol is that if a substance appears to have excessive moisture, "such as wet spots on the weight paper or actual water in the bag," the substance is dried; however, in this case Tipton did not see indicators of excessive moisture. (*Id.* at 412-413, 415).

{¶57} Tipton testified that Item 1 was a large chunk of crack cocaine with "no baggy," which weighed less than 0.1 grams. (*Id.* at 419-420).

{¶58} On re-direct examination, Tipton testified that in cases where she has observed excessive moisture, she weighs the substance before and after allowing it to dry. (*Id.* at 430). She testified that, simply because there was no excessive moisture visible with Item 2.2, it is not indicative that there was not moisture in it when she weighed it. (*Id.* at 431).

{¶59} On re-cross examination, Tipton testified that the BCI instruments do not detect the water contained in a substance. (*Id.* at 435).

{¶60} As its next witness, the State offered the testimony of Detective Joseph who testified that he participated in the July 15, 2015 controlled-narcotics operation by providing visual surveillance and by searching Heffelfinger's vehicle before and after he met with Thompson. (*Id.* at 446-447, 449-450). His search did not produce any contraband. (*Id.* at 449-450). Detective Joseph testified that he watched Heffelfinger arrive at Thompson's residence on July 15, get out of his vehicle, and approach the front of Thompson's residence. (*Id.* at 450). However, he lost his

view of Heffelfinger once Heffelfinger entered the front porch. (*Id.*). As part of the post-operational protocol, Detective Joseph again searched Heffelfinger's vehicle and did not find any contraband. (*Id.*).

{¶61} On July 16, 2015, in addition to providing visual surveillance, Detective Joseph searched Heffelfinger's vehicle prior to and after the operation. (*Id.* at 450-452). Detective Joseph testified that he "was able to observe [Heffelfinger] arrive, get out of the vehicle and walk up to the front of the residence," and make contact with Thompson. (*Id.* at 451).

{¶62} Detective Joseph also testified that he participated in the execution of the July 20, 2015 search warrant at Thompson's residence. (*Id.* at 452). He identified State's Exhibits 8 through 27 as photographs that he took depicting the residence as it appeared on July 20. (*Id.* at 453). In particular, he testified that State's Exhibits 9 and 10 reflect "the surveillance camera in the corner of the residence"; State's Exhibit 11 "is a picture of the monitor for the surveillance system"; "State's Exhibit 13 is a photograph of a cell phone next to the sofa"; State's Exhibit 14 is a photograph depicting an appliance in the residence with "baby diapers on the appliance showing that there's children in the home"; "State's Exhibit 18 is a weight that [was] found in the kitchen cupboard"; "State's Exhibit 19 is a digital scale"; State's Exhibits 24 through 27 are photographs of the cocaine "that

was found on top of the kitchen cupboard." (*Id.* at 453-455). According to Detective Joseph, during the execution of the search warrant, he observed:

> Throughout the residence I noticed that the furnishings in the residence were modern and nice, newer furniture, newer appliances. There was some remodeling going on in the home, in addition to the items that would be indicative of children living in the home, and also [a] large amount of US currency * * *; items indicative of drug trafficking, such as the digital scales, the weight for the scale.

(*Id.* at 456). Regarding the US currency, he noted that "[t]he bills were lower [denominational] bills," which is "an indicator for drug trafficking." (*Id.*).

{¶63} Detective Joseph testified that he learned that Thompson did not file a tax return from 2014 through 2016 and that she filed an affidavit of indigency in this case. (*Id.* at 457). (*See also* State's Exhibit 32). Detective Joseph identified State's Exhibit 33 as Thompson's affidavit of indigency, which reflects that she receives $500 monthly in income, has zero liquid assets, and has monthly expenses of $385. (July 18, 2017 Tr., Vol. II, at 457-458). (*See* State's Ex. 33). Detective Joseph testified that State's Exhibits 32 and 33 are not "consistent with finding Ms. Thompson in possession of over $1,400 in cash, expensive furnishings and remodeling her home." (July 18, 2017 Tr., Vol. II, at 458).

**{¶64}** According to Detective Joseph, Thompson's husband, Torrance, had been incarcerated "over three months" at the time that the search warrant was executed. (*Id.* at 458-459).

**{¶65}** On cross-examination, Detective Joseph testified that the complaint asserted that the cocaine seized from Thompson's residence weighed between five and ten grams. (*Id.* at 465-466). According to Detective Joseph, that weight includes the weight of the packaging. (*Id.* at 466).

**{¶66}** Detective Joseph testified that he was part of the investigation that resulted in Torrance going to prison for trafficking in cocaine. (*Id.* at 467-469). As part of the investigation involving Torrance, law enforcement did not search the Thompsons' residence. (*Id.* at 469). Detective Joseph agreed that, if Torrance was trafficking cocaine, the residence he shared with Thompson would contain contraband related to drug trafficking. (*Id.* at 470).

**{¶67}** Next, the State called Detective Brandon Bell ("Detective Bell") of the Fostoria Police Department who testified that he participated in the execution of the July 20, 2015 search warrant at Thompson's residence. (July 19, 2017 Tr., Vol. III, at 491-492, 494). Detective Bell testified that he "stood outside with the children" that were at the residence during the search-warrant execution. (*Id.* at 494).

**{¶68}** As its next witness, the State called Detective Boyer who testified that he participated in the controlled-narcotics operation involving Thompson on July

14, 2015. (*Id.* at 511-512). During the controlled-narcotics operation on July 14, 2015, Detective Boyer provided visual surveillance in which he watched Heffelfinger arrive at Thompson's residence and walk toward her front porch. (*Id.* at 516-517). However, Detective Boyer lost sight of Heffelfinger after he entered Thompson's front porch. (*Id.*).

{¶69} Detective Boyer also testified that he participated in the July 20, 2015 search-warrant execution at Thompson's residence. (*Id.* at 518). To execute the search warrant, law enforcement waited for Thompson to leave the residence because law enforcement knew that three children—ages three, five, and six—and an aggressive dog resided at the residence. (*Id.* at 519, 521). Once Thompson left the residence with her three children, law enforcement conducted a traffic stop of the vehicle that Thompson was operating and requested Thompson to return to the residence and secure the dog. (*Id.* at 519). He testified that the children "were upset when [law enforcement] first stopped Thompson." (*Id.* at 521).

{¶70} He testified that he conducted the inventory of the search-warrant execution. (*Id.* at 518). Detective Boyer identified State's Exhibit 35 as "the search warrant, inventory and property receipt" that he prepared on July 20, 2015. (*Id.* at 527). He testified that law enforcement seized

> the weight that [was] discovered in the kitchen, US currency, a
> prescription bottle containing numerous pills, the flakes of white

-28-

powder [found in a bedroom], some roaches of suspected marijuana, directional card of a guy by the name of Donald Barry, the [three] baggies of * * * the crack cocaine that was [sic] found in the kitchen, pinch baggies in the trash, digital scales found in the kitchen[,] three cell phones, more US currency, and then another pinch baggy found in the cushion of the living room [couch], and then four surveillance cameras.

(*Id.* at 527-528). (*See* State's Ex. 35). According to Detective Boyer, based on his training and experience, Thompson was preparing the cocaine for distribution because "the US currency was in small denominations. You have the scales. You have the * * * weight to check the scales to make sure of accuracy. You have the pinch baggies. You have the extra surveillance." (July 19, 2017 Tr., Vol. III, at 530). Indeed, he testified that, based on his training and experience, the evidence seized is indicative of trafficking as opposed to personal use because law enforcement "did not find any crack pipes, any choreboy [sic] or anything else they use for instruments to abuse for crack cocaine." (*Id.* at 532). Likewise, law enforcement did not "locate any drug abuse instruments on [Thompson's] person," in her vehicle, or any evidence of crack-crack cocaine abuse in her residence. (*Id.* at 532-533). Rather, law enforcement discovered evidence of personal marijuana use in the residence. (*Id.* at 533).

**{¶71}** Detective Boyer further testified that it was apparent that the three children were residing at Thompson's residence because Thompson admitted that they resided there and because "there was kids' stuff in there." (*Id.* at 522). Regarding the hazards to children residing in a residence in which narcotics trafficking occurs, Detective Boyer testified that children are at risk for ingesting the narcotics and are "being introduced to the criminal element, because they're having people * * * who are addicted to drugs show up at the residence to purchase" narcotics. (*Id.* at 533).

**{¶72}** Detective Boyer identified State's Exhibit 31 as a copy of BCI's report regarding the cocaine discovered in the kitchen, which indicates that the total weight of the cocaine is greater than ten grams. (*Id.* at 534-535). (*See* State's Ex. 31). He testified that, over time, crack cocaine "dries out" which decreases the weight of the substance. (July 19, 2017 Tr., Vol. III, at 535-536). According to Detective Boyer, narcotics traffickers do not dry crack cocaine prior to sale because "they want to get the most weight out of it to get the most money." (*Id.* at 536).

**{¶73}** On cross-examination, Detective Boyer identified Defendant's Exhibit A as a copy of the complaint he prepared regarding Thompson indicating that the weight of the cocaine seized was between five and ten grams. (*Id.* at 537-538). He testified that the cocaine was originally weighed in the bags in which it was contained. (*Id.* at 539). Discussing the discrepancy from the BCI report

indicating that the cocaine weighed over ten grams, Detective Boyer testified that law enforcement's weight estimate indicating that the cocaine weighed between five and ten grams "must have [been] a mistake." (*Id.* at 539).

{¶74} Detective Boyer testified that he was involved in the investigation of Torrance that resulted in Torrance being sentenced to prison for trafficking in cocaine. (*Id.* at 542). He testified that Torrance resides in the residence with Thompson "when he's not in prison." (*Id.*). According to Detective Boyer, the pinch bag discovered in the couch during the search-warrant execution is evidence of personal-drug use, presumably from Torrance's personal use. (*Id.* at 543-544). Detective Boyer testified that law enforcement did not contemporaneously search the residence when Torrance was arrested for trafficking in cocaine. (*Id.* at 544). Detective Boyer admitted that the surveillance system discovered at the residence could have been associated with Torrance's trafficking crime. (*Id.*). He could not remember whether there was any drug residue on the scale found during the search-warrant execution. (*Id.* at 547). He agreed that it was possible that if a person was operating a business out of their home, they would have "fives, tens and twenties" in US currency from customers. (*Id.* at 548).

{¶75} On re-direct examination, Detective Boyer testified that the digital scale he uses to calculate the presumptive weight of seized narcotics is not calibrated and that he is not an expert in weighing controlled substances. (*Id.* at 568). He

testified that "normal" people do not "have numerous cell phones along with digital scales, weights, large amounts of cash when they're unemployed or not filing taxes, and large amounts of controlled substances." (*Id.* at 569-570). He also testified that narcotics traffickers do not sell narcotics in the same amounts "especially with crack cocaine [because] there's no uniform size." (*Id.* at 570).

{¶76} On re-cross examination, Detective Boyer testified that the "official" weight of drugs from BCI is usually lower than the presumptive weight that he records because the presumptive weight is the gross weight, which includes the packaging. (*Id.* at 572).

{¶77} Thereafter, the State moved to admit Exhibits 1-35 and rested. (*Id.* at 572-575, 582-583). The State's exhibits were admitted without objection. (*Id.* at 574). Next, Thompson made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 575-582).

{¶78} Thompson presented the testimony of Torrance who testified that Thompson is his wife and that they reside at the same residence with their three children. (*Id.* at 584-585). Torrance testified that he has a criminal record and that he "sold drugs" and "used drugs." (*Id.* at 585-586). In particular, he testified that he used the powder form of cocaine and sold crack cocaine. (*Id.* at 589). He testified that he purchased the powder cocaine in "bulk." (*Id.* at 591).

{¶79} Because he was selling drugs, Torrance was convicted of trafficking in cocaine and sentenced to prison in 2015. (*Id.* at 587). According to Torrance, the transactions which led to his trafficking-in-cocaine conviction did not occur at the residence he shared with Thompson. (*Id.*). Rather, the transactions occurred in an apartment located above the beauty-supply business that Thompson was "running * * * with her mother." (*Id.* at 587-589).

{¶80} He testified that Thompson's mother owned the residence that Torrance and Thompson shared and that Thompson's mother decided to renovate the house by adding an additional bedroom. (*Id.* at 593-594). Regarding the "newer" furnishings, Torrance testified that they purchased the furnishings from "Aaron's," "[a] rent-a-center place." (*Id.* at 594). According to Torrance, Thompson received income from "running the family [beauty-supply] business." (*Id.*).

{¶81} Torrance testified that he knows Heffelfinger because he "sold him drugs several times." (*Id.* at 596-597). According to Torrance, Heffelfinger "owe[d] him] money from several incidents," which is why Heffelfinger was "taking money to [Thompson] while [Torrance was] in prison." (*Id.* at 597).

{¶82} Regarding the cocaine found in the kitchen, Torrance invoked his right against self-incrimination under the Fifth Amendment when asked about that cocaine. (*Id.* at 598).

**{¶83}** On cross-examination, Torrance testified that he went to prison for trafficking in cocaine on March 9, 2015 and was released in September 2016. (*Id.* at 599). Regarding his drug use, he testified that he used "[a] half gram or something" "[f]our or five times a day." (*Id.* at 600). Regarding the US currency discovered in the residence, Torrance testified that he "left her some money" and that she received income from the family business. (*Id.* at 600-601). However, he testified that the family business was closed from November 2014 through May 2015. (*Id.* at 601). He testified that he "sold drugs to support [his] addiction," but "fronted" Heffelfinger drugs or money. (*Id.* at 601-602).

**{¶84}** As its final witness, the defense called Nicole Lattanzio ("Lattanzio") of NMS Labs who testified that she analyzed the cocaine on behalf of Thompson. (July 20, 2017 Tr., Vol. IV, at 621,626-627, 631). Lattanzio identified Defendant's Exhibit B as a copy of her "Drug Chemistry Final Report." (*Id.* at 634). She testified that she analyzed two bags and concluded that the substances in those bags contained cocaine. (*Id.* at 635). She testified that one of the bags of cocaine weighed 5.70 grams plus or minus 0.02 grams. (*Id.* at 363). She explained that the difference from the weight reported by BCI of 5.81 grams "seems like a negligible amount of material that you would assume that would be consumed in testing." (*Id.*). She testified that the second bag of cocaine weighed 3.84 grams plus or minus 0.01 grams. (*Id.* at 638). She testified that NMS Labs' "balances are calibrated by

an external source once every six months, but their performance is verified daily anytime they're used for case work." (*Id.* at 637).

**{¶85}** On cross-examination, Lattanzio testified that her report is dated January 26, 2017. (*Id.* at 640). According to Lattanzio, there are two explanations for the differing cocaine weights: "either someone's scales are wrong or the weight changed." (*Id.* at 641). She stated that it is "a safe assumption" that the discrepancy in weight of the "crack cocaine" is that the substance lost weight over time as opposed to an incorrect scale. (*Id.* at 641-642).

**{¶86}** On re-direct examination, Lattanzio testified that she is unable to tell "how or when the water got into the substance" if she is testing a controlled substance that contains moisture. (*Id.* at 644). She agreed that it is "a possible assumption" that "the addition of water either by accident or by humidity [is] a possible explanation for a substance's weight going from low to higher to lower." (*Id.* at 645). She testified that substances packaged in "plastic would contribute to a higher humidity level." (*Id.*).

**{¶87}** Thereafter, the defense moved to admit Defendant's Exhibits B and C, which were admitted without objection, and rested. (*Id.* at 646-647).[1] The defense previously moved to admit Defendant's Exhibit A, which was admitted without objection. (July 19, 2017 Tr., Vol. III, at 574). The State did not present any

---

[1] Defendant's Exhibit C is Lattanzio's curriculum vitae. (July 17, 2017 Tr., Vol. 1 at 7).

witnesses on rebuttal, and Thompson renewed her Crim.R. 29(A) motion, which the trial court denied. (July 20, 2017 Tr., Vol. IV, at 649-653). The matter was submitted to the jury, which found Thompson guilty as to the counts of the indictment. (*Id.* at 754-763). The jury found Thompson guilty of the specification in Counts One and Four alleging that Thompson committed the offenses in the presence of a juvenile. (*Id.* at 755, 761). Also as to Count Four, the jury found that the amount of cocaine exceeded five grams and exceeded ten grams. (*Id.* at 760-761). The jury found that the surveillance-security system is subject to forfeiture. (*Id.* at 756, 757, 759). The jury found that the $1,415 in US currency and two cellphones are not subject to forfeiture. (*Id.* at 755-761).

{¶88} We first review the sufficiency of the evidence supporting Thompson's endangering-children conviction. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

{¶89} The criminal offense of endangering children is codified in R.C. 2919.22, which provides, in relevant part:

No person, who is the parent * * * of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

R.C. 2919.22(A). The phrase "substantial risk" in R.C. 2919.22(A) "means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). The Supreme Court of Ohio concluded that recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A). *State v. McGee*, 79 Ohio St.3d 193 (1997), syllabus.

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C). "Thus, to support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that [Thompson] (1) recklessly (2) created a substantial risk to the health or safety of one or more of her children (3) by violating a duty of care, protection or support." *State v. Norris*, 9th Dist. Lorain No. 14CA010699, 2015-Ohio-5180, ¶ 15.

{¶90} In her second assignment of error, Thompson argues that there is insufficient evidence that she endangered her children because there is insufficient

evidence that her children were present when Thompson sold narcotics to Heffelfinger. She argues that the only evidence that the State presented at trial that her children were present when she sold narcotics to Heffelfinger is Officer Elliott's testimony that "he may have heard what appeared to by [sic] children's voices in the background on one audio." (Appellant's Brief at 14, citing July 17, 2017 Tr., Vol. I, at 187). Thompson argues that the State did not offer any corroborating evidence that children were present at that time. Absent that evidence, Thompson argues that she was convicted of endangering children "based on only inferences that were derived by [Officer Elliott's] inferences." (*Id.* at 15).

{¶91} We disagree. There is sufficient evidence that Thompson endangered her children. Thompson ignores the evidence that she permitted narcotics and items related to trafficking in narcotics to be present in her residence in the presence of her children. That is, in addition to Officer Elliott's testimony that the video evidence of the July 14, 2015 controlled-narcotics operation depicts the sound of multiple children in the background during the transaction with Heffelfinger, the State presented sufficient evidence that Thompson recklessly created a substantial risk to the health and safety of her children—ages three, five, and six—by violating her duty of care, protection, or support.

{¶92} Indeed, Detective Boyer testified that Thompson admitted that the three children resided at the residence. Torrance also admitted that the three

children resided at the residence. Likewise, Detectives Boyer and Joseph observed evidence that the children lived at the residence while searching Thompson's residence on July 20, 2015. (*See e.g.*, State's Ex. 14). Prior to the search-warrant execution, Detective Boyer saw Thompson leave the residence with her three children. The children, who were in Thompson's vehicle when law enforcement stopped Thompson prior to executing the search warrant, were visibly upset when Thompson was stopped. *See Norris*, 2015-Ohio-5180, at ¶ 16 (concluding that the State presented sufficient evidence that Norris endangered her children, in part, because "when the police arrived at Norris' house seeking permission to search it, two of Norris' three children were present."). Likewise, Detective Bell testified that he stood outside of Thompson's residence with Thompson's children while law enforcement executed the search warrant.

**{¶93}** In addition to the evidence of children residing in the residence, contraband evidence—narcotics and narcotics-trafficking evidence—was seized as part of the search-warrant execution. (*See* State's Exs. 8-27). *Compare Norri*s at ¶ 16 (concluding that the State presented sufficient evidence that Norris endangered her children, in part, because a "large number of drugs and criminal tools discovered in the house."). In particular, in addition to the larger amount of cocaine discovered above the kitchen cabinets, law enforcement discovered cocaine "residue on one of the stands in the bedroom," a "pinch baggy * * * in the cushion of the living room"

couch, and "marijuana roaches in the ashtray in the kitchen." (July 19, 2017 Tr., Vol. III, at 524, 527-528, 533). *See Norri*s at ¶ 16 (concluding that the State presented sufficient evidence that Norris endangered her children, in part, because "drugs that were in powder form [were discovered] on the tray table in the master bedroom."). Stated another way, law enforcement discovered narcotics in Thompson's residence in areas in which there is a strong possibility that her children could access those narcotics. Further, Torrance, the children's father, admitted to abusing narcotics and trafficking in narcotics—a crime of which he was convicted and sentenced to prison three months prior to Thompson's arrest.

{¶94} Moreover, Detective Boyer discussed the potential risks children face residing in a residence in which narcotics are kept and trafficked, including the ingesting the narcotics and being exposed to criminals—drug addicts—who visit the residence to purchase narcotics. Not only is there evidence that narcotics were discovered in locations of Thompson's residence that her children could access, there is evidence that Heffelfinger—a criminal and drug addict—visited the home to purchase cocaine.

{¶95} Viewing this evidence in a light most favorable to the prosecution, we conclude that Thompson's endangering-children conviction is supported by sufficient evidence. A rational trier of fact could have found that Thompson recklessly created a substantial risk to the health and safety of her children. *See*

*Norris* at ¶ 17. *See also State v. Ray*, 2d Dist. Montgomery No. 24536, 2012-Ohio-840, ¶ 16 ("'Several courts have held that permitting illegal drugs to be present in the home or presence of children is a violation of R.C. 2919.22(A).'"), quoting *State v. Byrd*, 2d Dist. Champaign No. 99-CA-17, 2000 WL 353135, *2 (April 7, 2000), citing *State v. Tschudy*, 9th Dist. Summit No. 16820, 1995 WL 312695, *2 (May 24, 1995), *In re Beeman*, 11th Dist. Lake No. 93-L-098, 1994 WL 642465, *3 (Nov. 4, 1994), and *State v. Moore*, 6th Dist. Sandusky No. S-90-16, 1991 WL 355133, *5 (Sept. 20, 1991). Accordingly, Thompson's endangering-children conviction is based on sufficient evidence.

{¶96} Having concluded that Thompson's endangering-children conviction is based on sufficient evidence, we next address Thompson's argument that her trafficking-in-cocaine and possessing-criminal-tools convictions are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76. We will begin by addressing Thompson's manifest-weight-of-the-evidence arguments as they relate to her trafficking-in-cocaine convictions, then we will address her manifest-weight-of-the-evidence argument as it relates to her possessing-criminal-tools conviction.

{¶97} The criminal offense of trafficking-in-cocaine is codified in R.C. 2925.03, which provides, in relevant part:

(A)  No person shall knowingly do any of the following:

-41-

(1) Sell or offer to sell a controlled substance or a controlled substance analog;

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows:

* * *

(d) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds ten grams * * * and if the offense was committed in the * * * vicinity of a juvenile, trafficking in cocaine is a felony of the second degree.

R.C. 2925.03(A)(1), (2), (C)(4)(d).

**{¶98}** Challenging the weight of the evidence supporting her trafficking-in-cocaine conviction under R.C. 2925.03(A)(2), (C)(4)(d), Thompson argues in her first assignment of error that the evidence that she "intended to prep the cocaine ["in an amount exceeding 10 grams"] found in the home for sale" is outweighed by the evidence that she did not prepare cocaine in an amount greater than ten grams for distribution.  That is, Thompson offers two arguments challenging her conviction under R.C. 2925.03(A)(2), (C)(4)(d):  (1) Thompson challenges the evidence that she "was preparing to distribute cocaine" and (2) Thompson challenges the evidence that the weight of the cocaine exceeded ten grams.

**{¶99}** Thompson contends that the following evidence that she was not preparing to distribute cocaine is weightier than the evidence that she was preparing to distribute cocaine:  (1) "[t]he cocaine found in [Thompson's] kitchen cupboard as a result of the search warrant was not even close to being the same weight as the cocaine allegedly sold during the controlled-buys"; (2) the cocaine from the cupboard was "of different color, hardness and texture" than the cocaine from the controlled-narcotics operations; (3) "[n]othing found in the home was prepackaged for sale and there were no packages the size of what the CI allegedly bought"; (4) "the officer that photographed all the items seized from the warrant did not photograph any baggies used to package cocaine"; (5) "the cocaine turned over to

law enforcement by the CI after the controlled-buys had various weights, indicating that no scales were used or that the weights were not accurate" despite that "scales were found in [Thompson's] home"; and (6) Thompson's "husband [is] a known drug user and trafficker in cocaine." (Appellant's Brief at 11). Stated differently, Thompson argues that the weight of the evidence corroborates that the cocaine was for personal use.

{¶100} Notwithstanding that evidence, this is not an exceptional case where the evidence weighs heavily against Thompson's conviction. *See State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33. Rather, the evidence weighing in favor of the jury's conclusion that Thompson was preparing the cocaine for distribution is weightier than the evidence that she was not preparing the cocaine for distribution.

{¶101} The jury heard the testimony of Officer Elliott and Detective Boyer that, based on their training and experience, the cocaine constituted an amount greater than what they typically see as "personal use" cocaine. In addition, the jury heard law enforcement describe the items seized as part of the search-warrant execution. Regarding that evidence, the jury heard Detective Boyer's opinion that, based on his training and experience, the combination of the cocaine, the large amount of US currency in small denominations, the scale, the weight, the pinch baggies, and the surveillance system is indicative that Thompson was preparing the

cocaine for distribution. *Compare State v. Owens*, 9th Dist. Summit No. 23267, 2007-Ohio-49, ¶ 37 (noting that "the possession of 124.7 grams of powder cocaine, digital scale, sandwich bags, rubber bands, and small denomination bills totaling $2,600, permits a reasonable inference that [Owens] was preparing cocaine for shipment or distribution"), citing *State v. Williams*, 1st Dist. Hamilton No. C-040747, 2005-Ohio-6772, ¶ 19, *State v. Lyles*, 42 Ohio St.3d 98, 100 (1989), *State v. Smith*, 3d Dist. Union No. 14-01-28, 2002-Ohio 5051, ¶ 22, and *State v. Jolly*, 8th Dist. Cuyahoga No. 70482, 1997 WL 391317, *4 (July 10, 1997). *See also State v. Carroll*, 9th Dist. Summit No. 241109, 2009-Ohio-331, ¶ 24 (concluding that the jury did not lose its way in concluding that Carroll prepared narcotics for distribution because "a large amount of drugs and items associated with drug trafficking were found"); *State v. Bowling*, 8th Dist. Cuyahoga No. 93052, 2010-Ohio-3595, ¶ 58 (Bowling's personal-use "argument is belied not only by the way the drugs were packaged, but by the $250 in cash recovered from Bowling-an amount of cash that could suggest to a rational trier of fact that Bowling had been selling the crack cocaine rather than buying it.").

{¶102} Moreover, the jury could reasonably infer from the evidence presented at trial that Thompson was preparing the cocaine for distribution. "A jury can make reasonable inferences from the evidence." *State v. Knight*, 10th Dist. Franklin No. 16AP-288, 2016-Ohio-8134, ¶ 26. "'It is permissible for a jury to draw

inferences from the facts presented to them.'" *Id.*, quoting *State v. Sanders*, 6th Dist. Lucas No. L-96-379, 1998 WL 78787, *3 (Feb. 13, 1998), citing *State v. Palmer*, 80 Ohio St.3d 543, 561 (1997). "'The weight given to an inference is a question for the trier of fact and will not be disturbed unless it is such that reasonable minds could not reach such a conclusion.'" *Id.*, quoting *Sanders* at *3, citing *Palmer* at paragraph four of the syllabus.

{¶103} Officer Wedge described for the jury how cocaine is packaged for sale. Each of Heffelfinger's crack cocaine purchases from Thompson are of less weight than the cocaine that was found in Thompson's kitchen. Heffelfinger's purchases of $60 worth of cocaine from Thompson are approximately the same size, while his purchase of $100 worth of cocaine from Thompson is approximately double the size of the $60 purchases. Despite Thompson's argument regarding the various weights of the cocaine purchased by Heffelfinger, the jury heard Detective Boyer's testimony that narcotics traffickers do not sell drugs in the same amounts "especially with crack cocaine [because] there's no uniform size." (July 19, 2017 Tr., Vol. III, at 570).

{¶104} Thompson's personal-use argument is also belied by the evidence that law enforcement did not find evidence of crack-cocaine abuse in Thompson's residence, in Thompson's vehicle, or on Thompson. In particular, Detective Boyer

told the jury that law enforcement did not find instruments—crack pipes or chore boys—that crack-cocaine users utilize to abuse that drug.

{¶105} Although Torrance admitted that he used and sold narcotics, Torrance testified that he used "[a] half gram" "[f]our or five times a day" of the powder form of cocaine. Crack cocaine and cocaine in powder form were found in Thompson's residence. Since Torrance did not admit to using crack cocaine and there was no evidence of crack-cocaine abuse discovered in the residence, the jury could discount Torrance's personal-use explanation. Also discrediting Torrance's personal-use explanation is the amount of powder cocaine found—5.81 grams. That is, 5.81 grams is more than double the amount of cocaine that Torrance claimed to use per day. Moreover, Torrance did not claim ownership of the cocaine found in the kitchen.

{¶106} The jury also heard how crack cocaine is derived from powder cocaine. Since there was one larger bag of cocaine in powder form coupled with a larger bag of crack cocaine, the jury could reasonably infer that Thompson was preparing the powder cocaine for distribution by turning the powder cocaine into crack cocaine and repackaging and selling the crack cocaine in smaller quantities— similar to what was purchased by Heffelfinger. This inference is also bolstered by the evidence of the "crumbs or flakes" of crack cocaine found on a stand in Thompson's bedroom. The jury could infer that Thompson was dividing the larger

amount of crack cocaine and repackaging it into smaller amounts on the stand in the bedroom and the "crumbs or flakes" is what was left over from that process. Furthermore, the jury could infer that Thompson was the person preparing the cocaine for distribution because Torrance had been in prison for over three months at the time of Thompson's arrest.

{¶107} Considering all of the evidence, we cannot say that the jury lost its way in concluding that Thompson was preparing the cocaine for distribution. *See State v. Cereghin*, 3d Dist. Paulding No. 11-03-10, 2003-Ohio-6996, ¶ 8-9 (concluding that the jury's conclusion that Cereghin was preparing marijuana for distribution was not against the manifest weight of the evidence based on "[t]he circumstantial evidence and testimony tending to show that Cereghin prepared the marijuana for distribution"); *State v. Gilcreast*, 9th Dist. Summit No. 21533, 2003-Ohio-7177, ¶ 50 (concluding that Gilcreast's trafficking-in-marijuana conviction was not against the manifest weight of the evidence based on the circumstantial evidence adduced at trial that Gilcreast was preparing the marijuana for distribution). *See also State v. Brown*, 10th Dist. Franklin No. 16AP-753, 2017-Ohio-7134, ¶ 26 (concluding that Brown's convictions were not against the manifest weight of the evidence despite that his convictions were based largely on circumstantial evidence). For these reasons, the jury's conclusion that Thompson

was preparing the cocaine for distribution is not against the manifest weight of the evidence.

{¶108} Regarding her challenge to the weight of the evidence supporting that the cocaine weighed more than ten grams, Thompson contends that the jury lost its way in believing the cocaine exceeded that weight based on the conflicting testimony pertaining to the weight of the cocaine. Thompson argues that the weight of the evidence illustrates that the cocaine weighed less than ten grams because (1) Detective Boyer indicated that the cocaine weighed more than five grams but less than ten grams in the initial complaint based on the presumptive weight that he recorded and (2) Thompson's expert-witness's testimony that the cocaine weighed less than ten grams. Thompson contends that, if the cocaine weighed greater than ten grams, Detective Boyer's presumptive weight would have reflected a weight greater than ten grams because he weighed the cocaine along with its packaging. Further, Thompson contends that "there was so much plastic [packaging] that [Detective Boyer] mistakenly thought there were four baggies and not the three that were actually there." (Appellant's Brief at 9).

{¶109} Thompson's argument essentially asks this court to believe her expert witness's testimony over the State's expert witness's testimony based on the presumptive weight of the cocaine that Detective Boyer attested to in the complaint. However, we will not second-guess the weight that the jury assigned to the cocaine-

weight evidence or the jury's witness-credibility determination unless it is clear that the jury lost its way and a miscarriage of justice occurred. *See State v. Mitchell*, 8th Dist. Cuyahoga No. 93076, 2010-Ohio-520, ¶ 20. *See also State v. Banks*, 8th Dist. Cuyahoga No. 96535, 2011-Ohio-5671, ¶ 13 ("Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact."), citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984). After reviewing the evidence, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice in concluding that the cocaine weighed greater than ten grams that Thompson's trafficking-in-cocaine conviction under R.C. 2925.03(A)(2), (C)(4)(d) must be reversed and a new trial ordered.

**{¶110}** The State's expert witness, Tipton, concluded that the gross weight of the cocaine was 11.06 grams at the time of her analysis in July 2015. Tipton weighed the cocaine ten days after it was seized. Thompson's expert witness, Lattanzio, analyzed the cocaine's weight nearly 18 months later on January 26, 2017 and concluded that its gross weight was 9.51 grams.

{¶111} The jury heard that water is typically present in crack cocaine because it is a necessary component in the process of turning cocaine into crack cocaine. The jury also heard that crack cocaine loses weight over time because the water in the crack cocaine evaporates. Likewise, the jury was informed that weight loss also occurs from the sample removed from the evidence for analysis.

{¶112} Both expert witnesses noted that, of the two bags of cocaine at issue, one contained cocaine in powder form and the other contained crack cocaine. Lattanzio agreed that the weight she obtained from the cocaine in powder form was essentially the same result that Tipton obtained. As such, the jury was free to believe that the crack cocaine's reduction in weight over the 18-month period was the result of moisture evaporation. Likewise, the jury was free to accept Tipton's analysis since the jury was informed that cocaine traffickers do not dry crack cocaine prior to selling it because "they want to get the most weight out of it to get the most money." (July 19, 2017 Tr., Vol. III, at 536). Indeed, because of the way in which the Revised Code defines cocaine, it is inconsequential whether the cocaine is wet or dry when it is weighed. *See* R.C. 2925.01(X) (2014) (current version at R.C. 2925.01(X) (2017). *See also State v. Jones*, 7th Dist. Mahoning No. 06 MA 17, 2007-Ohio-7200, ¶ 23-24. As such, the jury was free to accept the weight of the cocaine established closer to the point in time it was discovered in Thompson's residence.

{¶113} Moreover, Detective Boyer was not certified as an expert witness; testified that he is not an expert in weighing controlled substances; testified that the digital scale that he used to obtain the presumptive weight of the cocaine was not calibrated; and admitted that the weight indicated in the complaint was a mistake. For these reasons, we conclude that the jury did not lose its way in concluding that the cocaine weighed greater than ten grams. *See Jones* at ¶ 41, citing *State v. Alexander*, 8th Dist. Cuyahoga No. 85688, 2005-Ohio-5200, ¶ 53-54 and *State v. Burrell*, 8th Dist. Cuyahoga No. 86702, 2006-Ohio-2593, ¶ 3.

{¶114} We conclude that Thompson's trafficking in cocaine conviction under R.C. 2925.03(A)(2), (C)(4)(d) is not against the manifest weight of the evidence.

{¶115} In her fourth assignment of error, Thompson argues that the evidence that she sold cocaine to Heffelfinger is outweighed by the evidence that she did not sell cocaine to Heffelfinger. In particular, she argues that "the CI was so incredible and the execution of the controlled buys so unreliable, that the convictions were against the manifest weight of the evidence introduced at trial." (Appellant's Brief at 18).

{¶116} Regarding Heffelfinger's credibility, Thompson argues that Heffelfinger had reason to fabricate purchasing cocaine from Thompson—namely, "to avoid prosecution for his own crimes." (*Id.*). Similarly, Thompson argues that

law enforcement's controlled-narcotics-operation protocol is unreliable and that Heffelfinger could have "set-up" Thompson by hiding the drugs on his person or in his vehicle.

{¶117} Although Heffelfinger admitted that he is a drug addict, has a felony record, and was motivated to work with law enforcement as a CI to avoid prosecution for possessing cocaine, "we are mindful of the jury's 'superior first-hand perspective in judging the demeanor and credibility of witnesses.'" *Suffel*, 2015-Ohio-222, at ¶ 33, quoting *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 125, citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. The jury heard the testimony of four law-enforcement officers regarding the pre-and-post operational protocol the Task Force utilizes to protect the integrity of their narcotics investigations that employ CIs since CIs are inherently untrustworthy. That is, the jury heard that law enforcement searched Heffelfinger and Heffelfinger's vehicle and did not find any contraband.

{¶118} Further, the jury heard the testimony of Heffelfinger who described the controlled-narcotics operations identically to law enforcement's descriptions. The jury was also able to view the video recording of two of the three controlled-narcotics operations. Indeed, in one of those recordings, the jury was able to observe Thompson place the cocaine on the window sill and Heffelfinger retrieve it. (*See* State's Exs. 3, 5). That evidence is weightier than the evidence that Heffelfinger

fabricated that he purchased cocaine from Thompson during the three controlled-narcotics operations. *See State v. Patterson*, 8th Dist. Cuyahoga No. 80409, 2002-Ohio-3100, ¶ 25 (concluding that Patterson's trafficking convictions were not against the manifest weight of the evidence despite Patterson's argument that the CI was "exclusively responsible for supplying the [narcotics] evidence"). *See also State v. Thompson*, 8th Dist. Cuyahoga No. 83382, 2004-Ohio-2969, ¶ 16 (rejecting Thompson's argument that his trafficking-in-cocaine conviction was against the manifest weight of the evidence because CIs are not credible). As such, we conclude that Thompson's trafficking-in-cocaine convictions under R.C. 2925.03(A)(1) are not against the manifest weight of the evidence. *See State v. Fisher*, 3d Dist. Hardin No. 6-13-03, 2014-Ohio-436, ¶ 11 (concluding that Fisher's trafficking conviction was not against the manifest weight of the evidence based on his sale of bath salts to a CI). *See also State v. Mason*, 5th Dist. Stark No. 2003CA00438, 2004-Ohio-4896, ¶ 15-20.

**{¶119}** Finally, in her third assignment of error, Thompson challenges the weight of the evidence supporting her possessing-criminal-tools conviction. The criminal offense of possessing-criminal-tools is codified in R.C. 2923.24, which provides, in relevant part, "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(A).

{¶120} On appeal, Thompson argues only that the evidence that the "scales, weight, bag, cash, and phones" were used in conjunction with her trafficking-in-cocaine offenses is less weighty than the evidence that she did not criminally use those items. That is, she argues that there is no evidence connecting those tools to her trafficking-in-cocaine convictions. In support of her argument, she points to the evidence that: (1) "the cocaine turned over to law enforcement by the CI after the controlled-buys had various weights, indicating that no scales were used"; (2) "[n]o fillers or other items for dividing substances were found"; (3) "there was nothing unusual about a household of [Thompson's household's] size having multiple phones and law enforcement never obtained phone records to see who the phones were registered to"; the cocaine discovered "was very high up and yellow, which is consistent the [sic] oxidation process overtime, which indicates that it may have been old"; (4) "nothing found in the home was prepackaged for sale and there were no packages the size of what the CI allegedly bought"; and (5) law enforcement "did not photograph any baggies used to package the cocaine." (Appellant's Brief at 16).

{¶121} The jury's conclusion that Thompson intended to criminally use the items seized by law enforcement is not against the manifest weight of the evidence. As we noted above, it is within the jury's prerogative to draw reasonable inferences from the evidence presented at trial. *Knight*, 2016-Ohio-8134, at ¶ 26. Again, this court will not disturb the weight given to an inference by the trier of fact unless it is

such that reasonable minds could not reach that conclusion. *Id.* Reasonable minds could reasonably infer that Thompson intended to criminally use substances, devices, instruments, or articles that she possessed. *See State v. Porter*, 8th Dist. Cuyahoga No. 57251, 1990 WL 100482, *2 (July 19, 1990) ("The trier of fact could have reasonably inferred that the appellant intended to use the money for criminal purposes as part of his illegal drug trade.").

{¶122} In addition to the narcotics discovered during the search-warrant execution, law enforcement discovered a surveillance system with surveillance cameras positioned to view the outside of the residence along with monitors and a recording device inside the residence. (*See* State's Exs. 9, 10, 11). Officer Elliott testified that surveillance systems are commonly found in homes of narcotics traffickers "to monitor their residence against theft" and "police." (July 17, 2017 Tr., Vol. I, at 201).

{¶123} Also discovered were: a digital scale, a weight, three cell phones; pinch baggies in the trash can; a pinch baggy in the cushion of the living-room couch; and a large amount of US currency in small denominations. (*See* State's Exs. 13, 18, 19, 35). Law enforcement indicated that the combination of those items is indicative of drug trafficking. *See State v. Toland*, 8th Dist. Cuyahoga No. 95322, 2011-Ohio-5150, ¶ 22 (concluding that Toland's possessing-criminal-tools conviction was not against the manifest weight of the evidence based on the

"cumulative effect" of law enforcement's testimony that Toland's possession of "$630 in U.S. currency, a gun, scale, and packaging materials" was indicative of Toland's intent to use them criminally). Likewise, the scale and the weight were discovered within close proximity—in the kitchen. Law enforcement informed the jury that a weight is commonly used to check the accuracy of a scale.

**{¶124}** Moreover, the evidence adduced at trial reflected that Thompson did not file tax returns from 2014 through 2016 and filed an affidavit of indigency in this case indicating that she receives $500 monthly in income, has zero liquid assets, and has monthly expenses of $385. Yet, in addition to the greater than $1,400 in cash found in Thompson's possession, law enforcement observed "modern and nice" furnishings, "newer furniture, newer appliances," and "remodeling going on in the home." (July 18, 2017 Tr., Vol. II, at 456). According to law enforcement, that evidence is not consistent with the evidence that Thompson is indigent and did not report any legitimate income to the IRS from 2014 through 2016. Indeed, Detective Boyer testified that "normal" people do not have "numerous cell phones along with digital scales, weights, large amounts of cash when they're unemployed or not filing taxes, and large amounts of controlled substances." (July 19, 2017 Tr., Vol. III, at 569-570).

**{¶125}** We conclude that the jury made a reasonable inference from that evidence that Thompson intended to criminally use the items seized by law

enforcement. *See Knight*, 2016-Ohio-8134, at ¶ 27. Thus, this is not an exceptional case where the evidence weighs heavily against Thompson's possessing-criminal-tools conviction. As such, Thompson's possessing-criminal-tools conviction is not against the manifest weight of the evidence.

{¶126} Thompson's assignments of error are overruled.

{¶127} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**