[Cite as *State v. Bartulica*, 2018-Ohio-3978.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                      Court of Appeals No. E-17-065

     Appellee                               Trial Court No. 2015-CR-358

v.

George Bartulica                              **DECISION AND JUDGMENT**

     Appellant                             Decided: September 28, 2018

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Martha S. Schultes, Assistant Prosecuting Attorney, for appellee.

Eric C. Nemecek, for appellant.

* * * * *

**JENSEN, J.**

**{¶ 1}** George Bartulica appeals from a judgment of the Erie County Court of

Common Pleas finding him guilty of one count of assault, two counts of felonious

assault, and one count of tampering with the evidence. For the reasons that follow, we

affirm the judgment of the trial court.

{¶ 2} On September 10, 2015, the Erie County Grand Jury issued a four-count indictment charging appellant with one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree ("Count 1"); one count of felonious assault in violation of R.C. 2903.11(A)(3), a felony of the second degree ("Count 2"); one count of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree ("Count 3"); and one count of tampering with evidence in violation of R.C. 2921.12(A)(1) ("Count 4"). The charges relate to an altercation that occurred outside of Rudy's Bar & Grill ("Rudy's") in Vermilion, Ohio, during the early morning hours of August 8, 2015.

{¶ 3} The following evidence was adduced at trial by jury.

{¶ 4} Kory Herchler is a regular at Rudy's Bar & Grill. Leanna Griebe is one of Kory's best friends. Late in the evening of August 7, 2015, Kory and Leanna went to Rudy's with two of Kory's brothers. A short time before "last call" Kory's brother called a cab. Leanna went outside and sat on a bench in front of the bar to wait for it. When Kory saw Leanna outside, he went out and sat next to her.

{¶ 5} A few minutes later, a man later identified as appellant, walked out of the bar. Kory and appellant got into a "scuffle." Leanna tried to break it up.

{¶ 6} At trial, Kory testified: "I don't know what was said or what provoked me to stand up, but I stood up." After Leanna pushed appellant away from Kory to break up the scuffle, Kory noticed blood on Leanna's arm. Kory explained:

2.

[S]he turns to me, Leanna, and says, oh Kory, you know, this horrified look on her face, and her arm is sliced open on – on her forearm.

At that rate, I, you know, grabbed her, grabbed her arm, tried to keep her calm in that situation, although not the calmest situation.

At that rate, Derrick Dillon, the bouncer, must have, you know, seen us out there, ran out with a towel. We wrapped her arm. My twin brother comes out and, you know, I was holding Leanna, and then I don't do well in those situations, so at that rate he, you know, kind of takes over for me as the placeholder of maker her – or making sure she stays calm. Again, I am not calm, clearly, in these situations. So I just kind of like kind of removed myself from it. He is then tending to her.

{¶ 7} Kory never saw a knife or any type of weapon in appellant's hand. He denied having any kind of weapon in his own hand during his confrontation with appellant. Kory insisted that at the time of the altercation, he, appellant, and Leanna were the only people outside the bar. Kory testified that he had never met appellant before the incident nor did he recall seeing appellant inside the bar earlier that night.

{¶ 8} Leanna testified that she recalled seeing appellant come out of the bar and say something to Kory. She could not remember exactly what appellant said, but described his words as "like poking at someone, like some type of fighting words." Both Kory and Leanna stood up. Leanna explained, "[I] notice that there was going to be some type of pushing, shoving. * * * I went to put my arm out to stop that, um, and by

3.

the time that I had turned back, didn't even feel anything, um, Kory grabbed my arm, put it in the air. I was bleeding all down." Friends called 911. A few minutes later, police arrived. An ambulance arrived shortly thereafter. They wrapped the wound and transported Leanna to the hospital.

{¶ 9} The emergency room doctor testified that he could not tell by looking at the wound whether it was caused by glass or a knife. However, he stated that the nurse's notes indicated that Leanna self-reported that she had been cut by a knife. Medical records from Leanna's August 8, 2015 visit to the emergency room at Amherst Health Center, reveal the laceration on Leanna's left forearm was 10 cm long and required 42 sutures in multiple layers of skin.

{¶ 10} At trial, Leanna testified that she had never seen or spoken to appellant before the altercation outside the bar. She did not even recall seeing him inside.

{¶ 11} During cross-examination, Leanna indicated that she was unsure what had cut her arm. She never saw a knife.

{¶ 12} Carolyn Ann Thayer is a bartender at Rudy's. Thayer was behind the bar on the evening of August 7, 2015, and into the early morning hours of August 8, 2015. Thayer testified that she had worked at the bar for ten years, but had never seen nor met appellant before that evening. She described appellant as "very non-threatening looking * * * normal summertime guy."

{¶ 13} Towards the end of the night, appellant became drunk; so drunk, that Thayer "cut[] him off." Thayer opined that appellant did not like being cut off. She

4.

recalled appellant making a derogatory comment towards her. She explained, "I kind of joked and laughed it off, and he said another comment to me and I ended up saying, well, my husband, who is in the Marine Corps, probably wouldn't appreciate the way you're speaking to me."

{¶ 14} Derrick Dillon is a bouncer at Rudy's. Dillon testified that in the early morning hours of August 8, 2015, he witnessed a man being rude to one of the bartenders. He asked the man to leave and escorted him to the door, without incident. A minute or two after the man left, Dillon looked out the window and noticed an altercation in front of the bar. He went outside. Kory and the man Dillon had just escorted out the door were pushing and shoving each other. He saw a woman, later identified as Leanna, "try to grab Kory away to stop or to get him to not do anything."

{¶ 15} Dillon went outside. He saw blood on the ground. Leanna was standing nearby holding her arm. Dillon explained,

> I looked back and I saw a guy with blood on his shirt and reaching or putting something in his back pocket. Then me and Nick [West] went to follow the guy because he was walking down the street. I got probably 10 feet away, I stopped. I told Nick to follow the guy and I went back to help the girl. * * * She had a pretty serious cut on her arm and I had – I ran back in to get some towels. I tied one towel around her arm, had her hold it above her head, and I covered her arm with another two or three towels just to try to stop the bleeding.

5.

{¶ 16} On cross-examination, Dillon explained that before he witnessed appellant put something in his back pocket, appellant made "some type of flipping motion with his hands." Dillon admitted that the item in the man's hand could have been a wallet. He did not see a blade.

{¶ 17} Nicholas West works the door at Rudy's. West testified that in the early morning hours of August 8, 2015, there were almost 100 people inside the bar. At some point, he noticed some "commotion" on the floor. The bouncer, Derrick Dillon, looked at West and indicated that he was escorting a man[1] out. According to West, the man walked past him and out of the bar without creating a "fuss." Moments later, however, West heard a commotion outside. West went out and saw a man and a woman. The woman's arm was bleeding. When West asked the couple what had happened, the couple "pointed to [the man he had escorted out the door] and said that he had stabbed the victim." West yelled into the bar, instructing his co-workers to call 911. West continued:

> I saw him over there. I said, you got to come back. The cops are on their way. You got to talk to 'em. He said, I didn't do anything. I said, well, they're saying that you stabbed her. You got to come back and talk to 'em. At that point [the man] took off walking down the street.

West testified that he and a few other people followed the man down the street. While everyone was walking, West saw something in the man's hand and confronted him. As

---

[1] When asked to identify the man that was the subject of his testimony, West identified a person sitting in the gallery of the courtroom. He did not identify appellant.

the man pushed West, something came out of the man's hand. West and the others continued to follow the man. One of the people with West exclaimed, "you've got blood all over your shirt." According to West, the man then took off his shirt and "threw it over to the side and said, I don't have anything on my shirt."

{¶ 18} At trial, West was asked to identify what was in the man's hand. West responded, "I saw him with something in his hand that looked like a knife. * * * That's what I thought was tossed when he pushed me." After the police arrived, West tried to explain to the officers what had happened. According to West, "[a]t that point the defendant came at me again and that's when the officer tackled him."

{¶ 19} Vermilion police officer Aaron Bolton was the first officer to respond to the scene. Bolton testified that when he arrived, appellant was surrounded by a small group of people down the street from Rudy's. The jury was shown footage from Bolton's body camera depicting Bolton's arrival and Bolton's questioning of appellant, bystanders, Kory, and Leanna. According to Bolton, none of the bystanders saw how the altercation between appellant and Kory started, but one bystander reported that he saw appellant close his knife and slip it into his back pocket. Another bystander reported that appellant had been wearing a sweatshirt, the sweatshirt was covered in blood, and that appellant had thrown the sweatshirt behind a nearby lamppost before police arrived.

{¶ 20} Bolton testified that initially, it was unclear how Leanna sustained the injury on her arm; some at the scene suggested the injury was caused by a knife, some indicated it was caused by a beer bottle. Bolton did not recall seeing any half broken beer

7.

bottles in the area. He did recall seeing "little pieces," "shards," and "chunks" of glass on the ground.

{¶ 21} Bolton described the victim as "stunned" by the incident. He explained that he and his fellow officers were unable to get pictures of the injury before she was taken to the hospital by ambulance because the arm was wrapped in towels. Bolton did, however, receive pictures of the injury from the victim after it was sutured. These photos were shown to the jury.

{¶ 22} Scott Holmes is a sergeant with the Vermilion Police Department. He handles Miro, the department's dual purpose K-9. Sergeant Holmes testified that Miro's primary function is narcotics detection, but he is also certified as "patrol dog" used for tasks such as criminal apprehension, searches, tracking, and handler protection. When Sergeant Holmes arrived on the scene, he instructed Miro to search. Miro is trained to search for items that have fresh human scent attached to them.

{¶ 23} Jeff Chandler is a sergeant with the City of Vermilion Police Department. Sergeant Chandler testified that upon his arrival at the scene, he was instructed to stay with appellant while other officers questioned witnesses. Sergeant Chandler explained that while he was standing with appellant, a group of gentlemen stood nearby. Everyone was talking, telling their side of the story. "Suddenly," Sergeant Chandler explained, "[appellant] pushed one of the gentlemen, I believe it was Nick West, pushed him backwards. * * * At that time I took [appellant] to the ground and Sergeant Bolton helped me and we got him cuffed and then we placed him in the cruiser."

8.

**{¶ 24}** Sergeant Chandler indicated that once appellant was in the cruiser, he questioned appellant about the knife and its location. Appellant started talking, instead, about his version of events. Sergeant Chandler testified:

> A. I get him out of the car and I ask him if he can remember or show me where he discarded the knife at, and he says he – he was on the corner. He said something about the sewers. We checked the sewers. There was no knife. And then he was asking where the bar was in relation to where he was at now, and I pointed up the road to where the bar was and where we apprehended him at. He just said he couldn't remember where it was or * * * what had happened with it. So he was taken back over and seated in the cruiser.

**{¶ 25}** After 10-15 minutes of searching, Miro alerted at a patch of sunflowers. There, officers found appellant's black handled SOG folding knife with a locking mechanism. The blade of the knife was in a "closed position."

**{¶ 26}** At trial, Sergeant Chandler showed the blade to the jury. He explained that the knife is "referred to as a SOG Flash." When asked to explain what the name means, Sergeant Chandler said, "I don't know for sure, but you can open it fast." Next, the prosecutor handed Sergeant Chandler the sweatshirt found at the scene. The following dialog occurred:

> Q. Do you notice anything about that sweatshirt?

> A. The blood pattern.

9.

Q. What is that?

A. It looks like the shirt was used to wipe something off. * * * The pattern on the shirt looks as if the knife possibly had been wiped off with the shirt.

Q. Now, I know you don't want to open this knife, Sergeant, but I'm going to have to ask you * * * to do that. * * * Can you lay the blade of that knife on that sweatshirt in the part that you were testifying looks like it had been wiped off or smeared?

A. Right in there.

Q. Do you see anything about that?

A. It pretty – pretty much matches or closely resembles the blade and part of the knife, as well as up in this area here where the knife would be wiped, and it goes down the shirt. The pattern travels across the shirt.[2]

{¶ 27} During cross-examination, questioning again turned to the sweatshirt. The following exchange occurred between defense counsel and Sergeant Chandler:

Q. All right. So let's talk about this knife and the spatter patterns on the sweatshirt, okay? Now, you were showing the jury how you felt that this pattern meant to essentially almost my client wiping the blade, correct?

---

[2] Photos of the knife and sweatshirt are included in the BCI report. A photo of the back of the sweatshirt depicts dark stains in various locations. It is not clear from the record what portions of the sweatshirt Sergeant Chandler was referencing in his testimony as matching or closely resembling the blade and part of the knife.

10.

A. Resembling it, yes.

Q. Resembling that, correct? You can't say for sure, can you? You can't –

A. No.

Q. – say for sure, but I want to bring your attention over here to this. Now, you've identified – you've – you've come on the stand here and you've said that you believe that this to be him wiping blood, correct?

A. Correct.

Q. Can you tell me what kind of spatter pattern this is?

A. I do not know.

Q. Do you know if it's – so you can't tell whether it's an arterial spatter pattern?

A. No.

Q. You cannot tell this jury because you're not trained in that kind of investigation as to blood splatter, correct?

A. As to spatter, correct.

* * *

Q. So you can't say within any degree of reasonable scientific certainty how this blood got there and – and what direction, directionality it got on there –

A. No.

**{¶ 28}** Linda Eveleth is employed by the Ohio Bureau of Criminal Investigations ("BCI") in the Laboratory Division. She holds a Bachelor of Science and a Master of Science in biology. At trial, she was "identified and qualified as an expert in the testimony concerning the DNA analysis and biological fluid analysis." Ms. Eveleth testified that the tip of the blade of the knife was tested. No blood was identified. However, a DNA profile was obtained and it was consistent with Leanna's DNA. Ms. Eveleth further testified that a cutting from the stain on appellant's sweatshirt was tested. The results indicate that the stain was "probably blood" and that the DNA profile obtained from the cutting was consistent with Leanna's DNA.

**{¶ 29}** Appellant testified that he walked to Rudy's bar with two friends around 9:30 p.m. on August 7, 2015. They played pool and had some drinks. At some point in the evening, appellant's friends left. Appellant stayed to have a few more drinks. When he went to sit down at the bar, he noticed a woman a few seats down. It was Leanna. Appellant explained, "when I ordered my drink, I also told the bartender that if [Leanna] would like anything that I could – I would pay for it, if she wanted." Moments later, a man sat down next to Leanna. It was Kory. Leanna responded to appellant's drink offer by saying "my husband is a Marine." Appellant explained, "I scoffed and said, oh, the Marines."

**{¶ 30}** Appellant testified that earlier in the evening, one of his friends had informed him that Kory was "a local" that had used his status as a Marine to "instigate

12.

fights." Appellant admitted that he should have known Kory was "someone to avoid in that circumstance specifically with regard to * * * the subject of a Marine."

{¶ 31} Appellant indicated that when he left the bar around 1:30 a.m., three men were standing directly in front of him. He noticed Kory sitting on a bench with Leanna. Appellant explained,

I was fishing a cigarette to have on my walk, and I noticed [the] three men * * * stopped talking and turned and advanced towards me. One of them was – one of them chucked a cigarette like at my feet, and I – and I had – at that time I was pretty apprehensive as to what was going to happen, um, because I had recognized them before, and so the only person that I knew that I thought I could diffuse the situation, um, being that he must know a Marine and he knows my friend, who's also a Marine, was to turn and ask, and the question I asked was: Do you think it's ok to threaten people because you are a Marine?

* * *

Well, at that point I was pretty apprehensive what was gonna happen, and like I said, I made that statement, and then Mr. Herchler got straight up and he said that he was going to kick my ass, and at that point I – I knew that all my options basically were gone and – and that if I wasn't gonna get a punch this way, I was just gonna get hit this way from Kory.

{¶ 32} According to appellant, as soon as Kory stood up, appellant pulled his hands out of his pockets, his keys were in his left hand and his knife was in his right hand. He placed both hands on Kory's chest and tried to throw him into the group of men. Appellant recalled falling backwards. By the time appellant stood up, Leanna and Kory were gone, but the three men were still there. Appellant started walking away from the men, backwards. At that point, someone walked out of the bar and stated that Leanna had been cut. The three men went inside the bar.

{¶ 33} At trial, appellant explained that during the summer he usually kept his knife in his pocket. He used it for his work at a marina. Appellant stated, "I knew that I had my knife and that it was possible that I could have cut her." He explained, "So I go back to Rudy's. I'm walking back to Rudy's I'm looking at my knife and I'm like looking at it. I open it a couple times. I look around in front of Rudy's. I'm checking to see if there's anything on it. There's nothing on it." Then, according to appellant, someone walked out of the bar and accused him of having a knife. More people started coming out of the bar. Then, someone accused appellant of having blood on the back of his sweatshirt. So, appellant took off his sweatshirt to see what people were talking about. When he looked at the back of his sweatshirt, he noticed the blood. For a moment, he thought that perhaps, he too was injured. Appellant soon realized he wasn't.

{¶ 34} Appellant started walking away, again. Someone said they had called the police. Appellant set the sweatshirt next to a lamppost. Appellant's confusion led to

14.

frustration. By the time the police arrived, appellant tossed the knife down by some sunflowers.

{¶ 35} At trial, appellant was adamant he did not cut Leanna:

Q. You have a lot of reasons not to tell the truth here? Why should these people believe you?

A. Because I didn't cut Leanna.

Q. You just said you didn't know if you did.

A. I believe I did not cut Leanna.

Q. Did your knife ever open? Did you ever see your knife open during the course of that evening?

A. No.

Q. Did you ever brandish your knife at anyone else?

A. No.

Q. As that mob moved towards you, did you pull that knife out, open it up, and show it to them?

A. No.

Q. You ever stab somebody before?

A. No.

Q. Ever cut somebody with your knife before?

A. No.

15.

{¶ 36} The jury found appellant guilty on all counts. The trial court merged the convictions for Counts 1 and 2, and the state elected to proceed to sentencing on Count 1. Appellant was sentenced to 120 days in the Erie County Jail and placed on a five-year term of community control. He was ordered to pay court costs and the costs of restitution.

**First Assignment of Error**

{¶ 37} In his first assignment of error, appellant asserts,

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN THE CONVICITONS IN VIOLATION OF BARTULICA'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 38} "A sufficiency of the evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 28, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When reviewing for the sufficiency of the evidence, an appellate court's function is to "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph

16.

two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 39} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2). R.C. 2903.11(A) provides that "No person, shall knowingly do either of the following: (1) Cause serious physical harm to another * * *; (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 40} In his first argument under his first assignment of error, appellant contends there was insufficient evidence that appellant's knife constituted a "deadly weapon."

{¶ 41} R.C. 2923.11(A) defines "Deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." "[A] knife is an instrument readily identifiable as one capable of inflicting death." *State v. Watters*, 8th Dist. Cuyahoga No. 82451, 2004-Ohio-2405, ¶ 36, citing *State v. Curnutte*, 9th Dist. Lorain Nos. 4189, 4198, 1987 Ohio App. LEXIS 8687 (Sept. 9, 1987), citing *State v. Anderson*, 2 Ohio App.3d 71, 440 N.E.2d 814 (1st Dist.1981); *State v. Thorpe*, 9th Dist. Lorain No. 3856, 1985 Ohio App. LEXIS 8884 (Oct. 9, 1985). However, knives are adaptable to many legal uses. "In order to show appellant was carrying a deadly weapon, the state was required to prove either (1) that the knife was designed or specifically adapted for use as a weapon, or (2) that the defendant possessed, carried, or used the knife as a weapon." *Id.* at ¶ 37.

17.

{¶ 42} Here, appellant admitted that he had the knife in his hand when he encountered Kory in front of the bar. However, he claimed that the blade of the knife was closed. No witness saw a knife in appellant's hand during the confrontation. However, the bouncer, Derrick Dillon, testified that when he walked outside to address the individuals involved in the altercation, he saw appellant make a "flipping motion" and put something in his back pocket. Further, appellant testified that he opened the knife and looked for blood on the blade after the incident occurred.

{¶ 43} As is the case with many criminal convictions, the credibility of the appellant is central to the case. "Ohio courts have held that the testimony of one witness, if believed by the jury, is sufficient to support a conviction. The issue of witness credibility is a matter within the province of the jury." *State v. Williams*, 5th Dist. Stark No. 2016 CA 00074, 2017-Ohio-803,¶ 54, citing *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990).

{¶ 44} Here, the jury was presented evidence about a fact in dispute—whether the knife was open when he confronted Kory. While there was no witness that could affirmatively state that the blade of the knife was open, there is circumstantial evidence supporting that position: the wound itself, the movements leading to the wound, the DNA on the blade of the knife, and appellant's admission that he opened the blade to look for blood. If the jury concluded that appellant brandished the knife while confronting Kory, then the evidence was sufficient for a jury to conclude that the knife was, in fact, a deadly weapon. Had the jury believed appellant's statement that the knife

18.

remained unopened during the confrontation, that conclusion would not be possible. *See Watters* at ¶ 39 ("The fact the weapon was openly carried and displayed is sufficient evidence for a jury to determine that the knife was a deadly weapon."). Appellant's first argument under his first assignment of error is not well-taken.

{¶ 45} In his second argument under his first assignment of error, appellant asserts there was insufficient evidence that the knife caused Leanna's injuries.

{¶ 46} Above, we addressed circumstantial evidence that the jury could have used to infer that the knife was open. The same circumstantial evidence is relevant to the jury's consideration of the cause of Leanna's injuries. "Circumstantial evidence" is defined as "[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought proved." *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979). "The distinction between direct and circumstantial evidence is that direct evidence can prove a fact by itself; circumstantial evidence proves a fact from which an inference of the existence of another fact may be drawn." *State v. Pointer*, 8th Dist. Cuyahoga No. 100608, 2014-Ohio-4081, ¶ 7.

{¶ 47} Various witness accounts attest that the injury occurred when Leanna pushed appellant away from Kory. If the jury believed that appellant was brandishing his knife when he confronted Kory, the jury could infer that the knife caused Leanna's

19.

injury. Appellant's second argument under his first assignment of error is not well-taken.

{¶ 48} In his third argument under his first assignment of error, appellant contends that there was insufficient evidence that appellant acted "knowingly."

{¶ 49} To be guilty of felonious assault, a defendant must act "knowingly." R.C. 2903.11(A). R.C. 2901.22(B) defines the term "knowingly" by stating that "[a] person acts knowingly, regardless of his purpose, when he is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 50} Here, the state presented evidence that appellant confronted Kory in front of the bar while holding a knife. Appellant testified that he had both fists pushed against Kory's chest when he tried to throw Kory into a group of men during the confrontation. Appellant claims that the blade of the knife was not open. If the jury found appellant's testimony incredible, then it could infer that the defendant acted knowingly. Cutting someone with a knife is a natural result of pushing someone with an open knife in hand. Appellant's third argument under his first assignment of error is not well-taken.

{¶ 51} Appellant was also convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

20.

**{¶ 52}** In his fourth argument under his first assignment of error, appellant asserts that appellant never attempted to destroy or conceal the sweatshirt or knife, he simply discarded the items after the altercation with Kory. In support of his argument, appellant points to his own testimony at trial. In regard to the sweatshirt, appellant explained that he took off his sweatshirt and placed it by a lamppost he "wanted to get if off [his] hands, but * * * know where it was." In regard to the knife, appellant explained the he put it "down * * * by the sunflowers" when the police arrived because he was apprehensive about how they would react if he had the knife in his possession. Appellant argues that both items were placed "in the plain view of others and in locations which would be easily accessible to the police." The sweatshirt was easily found by law enforcement. Sergeant Chandler testified that looked for the knife, but could not find it. The K-9 unit was able to locate the knife.

**{¶ 53}** Nicholas West testified that he informed appellant that the cops were on their way because "they're saying that you stabbed her." This information was relayed to appellant before he discarded the items. Thus, a jury could reasonably determine that appellant attempted to conceal the items after he knew that an official proceeding or investigation was likely to be instituted. Appellant's fourth argument under his first assignment of error is not well-taken.

**{¶ 54}** Construing all of the evidence in a light most favorable to the state, we find that appellant's felonious assault and tampering with evidence convictions were

21.

supported by sufficient evidence. Thus, appellant's first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 55} In his second assignment of error appellant asserts,

BARTULICA'S CONVICTIONS FOR FELONOUS ASSAULT

AND TAMPERING WITH EVIDENCE ARE AGAINST THE

MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 56} "A manifest weight of the evidence challenge contests the believability of the evidence presented." *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. When determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility, and decide whether in resolving any conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 57} Above, we addressed appellant's credibility and the circumstantial evidence we found sufficient to support appellant's conviction. Here, we emphasize that credibility is an issue to be determined by the jury. An appellate court "will not second-guess * * * jury's witness-credibility determination unless it is clear that the jury lost its

22.

way and a miscarriage of justice occurred." (Citations omitted). *State v. Thompson*, 3d Dist. Seneca No. 13-17-26, 2018-Ohio-637, ¶ 109.

{¶ 58} Here, a reasonable fact finder could have found beyond a reasonable doubt that appellant knowingly cut Leanna with a deadly weapon and tried to conceal evidence of the assault. This is not the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. *See Prescott* at ¶ 48. Therefore, appellant's second assignment of error is not well-taken.

## Third Assignment of Error

{¶ 59} In his third assignment of error appellant asserts,

THE TRIAL COURT ERRED BY PERMITTING TESTIMONY REGARDING BLOOD SPATTER PATTERNS WITHOUT PRIOR EXPERT QUALIFICATION AND/OR A PROPER FOUNDATION.

{¶ 60} The parties agree that Sergeant Chandler was not certified as an expert witness in this case. The question, therefore, is whether the trial court erred when allowed Sergeant Chandler to offer opinion testimony as a lay witness over appellant's objections.

{¶ 61} Evid.R. 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

23.

{¶ 62} Over appellant's objection, the trial court allowed Sergeant Chandler to testify as to what he "noticed" about the sweatshirt. He replied, "It looks like the shirt was used to wipe something off. * * * The pattern on the shirt looks as if the knife possibly had been wiped off with the shirt." Sergeant Chandler then went on to lay the blade of the knife on the sweatshirt in the area that the officer was referring to.

{¶ 63} Sergeant Chandler's testimony is based on his personal observation. His testimony is helpful to the trier of fact in determining whether the knife's blade was open or closed during appellant's confrontation with Kory. As such, it is lay witness testimony properly admitted under Evid.R. 701. Accordingly, appellant's third assignment of error is not well-taken.

### Fourth Assignment of Error

{¶ 64} In his fourth assignment of error, appellant asserts:

THE PROSECUTOR'S IMPROPER STATEMENTS DURING CLOSING ARGUMENT DEPRIVED BARTULICA OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶ 65} In support of his argument, appellant asserts that the state made several prejudicial statements regarding the elements of the offenses and the state's burden of proof during closing argument. Specifically, appellant claims that with respect to the element of intent, the state informed the jury that "if you bring a * * * knife, and you take it out and it's used and it hurt's (sic) someone * * * you've knowingly cause or attempted to cause serious physical harm." Appellant further asserts that the state improperly stated

24.

that appellants act of discarding the sweatshirt and knife were sufficient to convict him of tampering with evidence. Finally, appellant contends the trial court "effectively instructed the jury that a knife constitutes a 'deadly weapon' per se" when it stated: "A knife is a deadly weapon."

{¶ 66} Generally, "the prosecution is entitled to a certain degree of latitude in summation." (Citations omitted.) *State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d749 (2001). A reviewing court must view the "state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." *Id.*, citing *State v. Moritz*, 63 Ohio St. 2d 150, 157, 407 N.E.2d 1268, 1273 (1980).

{¶ 67} During closing, the state summarized the testimony of each of its witnesses. It then instructed the jury to remember the meaning of "circumstantial evidence" and how that could be used to determine appellant's guilt. Finally, the state addressed one of the most difficult issues for this jury, appellant's intent. The state asserted:

> What I want you to remember, ladies and gentlemen, are a few things. One is that the defendant took the stand and he told you a story, and if you listen to what he said and then you put it in perspective with the other witnesses that you heard from, he actually admits to several of the elements of the counts, and I think your job is probably going to be, well, what if he didn't mean to do it? What if it was an accident? You get the jury instructions from the Court. Your job is to put that with the facts that you've heard and deliberate and – and return a verdict. But remember, if

25.

you bring a weapon, a knife, and you take it out and it's used and it hurts someone, it cuts someone, you've knowingly caused or attempted to cause serious physical harm.

The state then asked the jury to return guilty verdicts on each and every count against appellant.

{¶ 68} Before summation, the trial court instructed the jurors that statements made during closing argument are not evidence, but an "argument as to what they believe their evidence has shown." After summation, the trial court properly instructed the jurors on each and every element of the offenses charged.

{¶ 69} We have reviewed the closing argument in its entirety to determine whether prejudicial error occurred. We conclude that the alleged statements, even if improper, did not permeate the state's argument so as to deny appellant a fair trial. For this reason, we find appellant's fourth assignment of error not well-taken.

{¶ 70} Conclusion

{¶ 71} The judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                          JUDGE

Thomas J. Osowik, J.

                                           _____
James D. Jensen, J.                                       JUDGE
CONCUR.

                                           _____
                                                          JUDGE